Chief Justice Robertson,
delivered the opinion of the court.
Thomas H. Pindall, being indebted to James Morrison upwards of ‡7,000, gave him a deed *399 of trust, in 1815, on notes which he held on Thomas J. Garret, and on other property, to secure the payment of the debt.
On the 9th of November, 1816, Thomas J. Garret, to secure the debt which he owed to Pindail, executed, in trust to Charles Wilkins, Lewis Sanders, and John T. Mason, a deed for several slaves.and tracts of land and other estate. This deed was acknowledged and recorded in November, 1816, in the clerk’s office of Fayette, and admitted to record, on the certificate of the clerk of Fayette, in the clerk’s office of Montgomery county, in the same month.
Garret lived in Montgomery and retained the possession of the slaves.
On the 18th of November, 1818, Pindail having agreed to transfer to John W. Hunt, his debt on Garret, in part payment of a large debt which he owed to Hunt, exceeding $20,000, a release was executed by Pindall’s trustees,and himself to Garret, for Hunt’s benefit, of all the property conveyed by the deed of 1816; and thereupon, at the same time, Hunt took from Garret some property, and his individual notes for a part of the debt thus assumed by him, and agreed to take his notes with security for the remainder, which was $3,500, to be paid in seven annual instalments of §500 each, with interest from the date of the notes; and in consideration thereof, released Garret from his liability under the deed of 1816, and that of Nov. 1818.
Before the consummation of this contract between Hunt and Garret, Hunt had received the following letter, dated,November 6th, 1818.
“Mr. John W. Hunt:
Sir, — Mr. Thos. J Garret applied to us to enter his security with some other persons, for the payment of $500 a year for seven years; should the other gentlemen refuse to join with us as security, we will, at any time, join in with Mr. Garret as his security to you for that amount to be paid as above stated, with interest,
Respectfully,.your obt. serv’ts,
EDW’D. STOCKTON.
JOHN MASON.”
*400 This letter Hunt retained, and seven notes were £Dnwn, according to the contract, bearing date 18th 1818, and delivered to Garret to procure the signatures of Stockton and Mason,(and)any of the others who liad been mentioned, as sureties, if any of them should be willing to become bound.
Afterwards, these notes were signed and acknowledged by Garret, Edwd. Stockton, John Mason and Henry Daniel, and delivered to Hunt.
To indemnify his sureties, Garret, on the 14th of August, 1813, conveyed lo S. D. Everet, in trust for their benefit, some of the slaves' which had been included in the deed of 181G; and lands, lots, a brown horse, household and kitchen furniture, &c.
It is represented, that there is a prior claim to some of these slaves, stated to have originated as follows:
In Sept. 1818, Jas, Morrison, with the assent of Pin-dall, had agreed to take from Garret, certain slaves, and to give Pindall a credit for the amount which he should allow for them, and for which Pindall agreed to give Garret a credit. And accordingly, sometime in' Sept. 1818, C. Banks, then of Mountsterling, who had been selected for that purpose, having reported bis estimate of the value of the slaves, Morrison acquiesced in the valuation; and thereupon,it was a-grecd between him and Garret, that the slaves were bis property, but that Garret might retain them for a stipulated term, on hire also fixed by «Banks. Among these slaves, are those afterwards included in the deed of trust to Everet.
In 1820, Morrison sued Garret in detinue for the' slaves, Garret having refused to surrender them.
This suit was removed to Bourbon and continued until 1823, when Morrison having died, it was revived in the name of Henry Clay, as his executor, who,in May 1824-, pending the suit,filed a bill in chancery against Garret, Everet, Mason, Stockton and Daniel, to restrain them from removing any of the slaves beyond the jurisdiction of the court. The court granted a restraining order, in pursuance of which, the slaves were taken by the sheriff of Montgomery, and hired out in June, 1824.
*401 Clay obtained a judgment in the action of detinue for all the slaves, except Tom Hunt, who is not included in the deed of trust to Everet.
., After this judgment was rendered, Daniel, Everet, Mason and Stockton, filed their answer to the bill which had been filed by Clay, and made it a cross bill against Clay, Hunt and others. In this, they allege, that the deed of trust to them was “bona fide* and valid, and that the pretended contract of sale by Garret to Morrison, was fraudulentas to them, because Garret had continued in the possession after the date of the contract. They also allege, that they never heard of this sale, until after the date of the deed of trust for their benefit, in August, 18lJ; and that Hunt and Garret induced them to become Garret’s sureties, by false and fraudulent representations to them, that there was no lien or incumbrance ori the slaves.
Daniel also, for himself alone, avers, that wheti Garret presented the notes to hirii for his signature, he refused to sign them until he could see Hunt and ascertain from him, whether the Slaves vvefe Unencumbered; that shortly afterwards, Hunt catne td Mountsterling and assured him that he had no lien on the slaves, and that he knew of no Claim to them,- ei-fceptthat of Garret, whereupon; he signed the notes.
He then charges, that Hunt did know of Morrison’s claim, and fraudulently concealed it.
They all affirm, that they would not have signed the notes, if they had known of Morrison’s claim; They pray for a decree setting aside the claim of Morrison’s executor, and subjecting the slaves to the payment of the notes to Hunt, or for a dec'ree enjoining, as to them, the enforcement of the notes by Hunt.
Hunt having obtained judgment on five of tbé notes, Daniel, Mason and Stockton, prayed that the judgments should be enjoined. The injunctions hav-' ing been granted, Hunt answered; He denies the allegations of fraud; denies that he knew of Morris son’s claim when Daniel or the other sureties signed the notes, and denies, that he ever made any othef statement to Daniel, Mason or Stockton; than that kt' *402 had no claim to the slaves. He also denies the jurisdiction of the court.
Clay, in his answer, affirms the legality of Morrison’s purchase of the slaves, and also denies the jurisdiction of the court.
Garret and two of the trustees answered-, but it is not necessary to state any thing more in relation to their answers, than that they were filed.
The cross bill was taken for confessed against Pin-dalland Wilkins.
On the final hearing, th'. original bill was dismissed; and on the cross bill against Hunt, the circuit court decreed, that Hunt’s judgments should be perpetually enjoined as to Daniel, Mason and Stockton, and that they should be released and exonerated as sureties in the other two notes, on which judgments had not been obtained.
To reverse this decree, Hunt has appealed to this court.
The principal, and only allowable object of the original bill, was to secure the slaves until after the trial of the action of detinue. This end having been-accomplished, it was right to dismiss the bill after the judgment at law had been obtained. Clay has acquiesced in the decree; therefore, it will be unnecessary to take further notice of the dismission of the bill.
The complainants in the cross bill, have not complained that there was no decre in their favor against Clay. They have, as a matter of course, acquiesced. They had no just cause for complaint. Their answer in the nature of a cross bill was not filed until after the trial in the action of detinue. There was then no necessity for an answer. The bill was then, for any legitimate purpose, “functus officio. It is true, that there was a prayer in it for a nullification of the deed of trust to Everet. But this prayer was not only unnecessary and incautious, but inadmissible. If Morrison’s purchase were legal and valid, it was not material, whether the deed of trust to Everet was so or not, because the deed of trust was subsequent to the sale to Morrison. If Morrison’s claim were *403 not good as between him and the complainants in the -cross bill the deed of trust for their benefit, was not affected by that claim. If they had been in sion of the slaves, the remedy of Morrison’s executor against them was legal.
But they were not in possession, and pending a suit at law against Garret who was in possession, the chancellor should not have entertained a bill against Daniel and his colleagues, for the purpose of trying, in equity, whether they had any available title to the same slaves.
As to Hunt, the cross bill may be considered as an original, and taking it in this attitude, the court had a right to award the injunction and hear the cause.
But the record will not sustain the decree which the circuit court rendered against Hunt.
So much of the decre as exonerates Mason and Stockton from their liability as sureties in the seven bonds, is without the semblance of proof to justify it.
They did not allege nor prove that Hunt induced them to become responsible to him as the sureties of Garret,- nor have they intimated that he made any false representation to them, or withheld from them any thing which it was his duty to disclose to them. They have complained that Garret deceived them; and they have suggested, that Garret, at Hunt’s instance,presented the notes to them for theirsignatures. So far as they are concerned, there is no pretext for implicating Hunt in any fraud direct or indirect, orin any act or omission which could affect the validity of their obligation as Garret’s sureties. Not only is there no allegation nor proof against Hunt, as between him and them, but there is strong and conclusive negative proof in his favor, which it would be difficult for them to resist. At the instance of Garret, and without Hunt’s solicitation, or knowledge, (so far as any thing appears in the record,) they had consented to become bound with Garret.
By their letter of the 6th Nov. 1818, they notified Blunt of this, their determination. He had not then made his contract with Pindall and Garret; nor had Pindall and his trustees then released to Garret the property which he had conveyed to them in 1816. *404 gut upon the receipt of this letter, the contract was completed; the property was released to Garret, and on the faith of the letter, Hunt released Garret from liability to him, in consequence of the release for his benefit by Pindall and the trustees. Mason and Stockton had not asked Hunt whether he had any claim to the slaves; nor whether he knew of any lien upon them. He had no claim on them, nor interest in them at the date of their letter. All the claim he ever had he derived from the release on the 18th November, 18l8, which was the result of a contract induced, in some degree, if not altogether, by the letter, find the benefits of which he surrendered in consideration, in part, of the promise of which the letter assured him. This letter, therefore, would bind Mason and Stockton, even if they bad never signed the notes. They attempted to prove by Garret, that when they signed the notes, there was some understanding that they were, not to be bound, unless Daniel should also, sign them. This, Garret docs not satisfactorily establish. But if it had been certainly proved, it could not benefit them. Their promise to Hunt intimated no such condition or qualification; on the contrary, the letter assured him that they would be bound whether any other person should, agree, to become responsible with them or not. They, therefore, had no right to annex any condition to their obligation when they signed the notes; it was too late to retreat; they had gone beyond the “locus penitentio.” Besides, there is no allegation in the bill, which would authorize the proof which they attempted to extract froni Garret; and proof without allegation, is as in-9s- allegation without proof. Moreover, if they had both alleged and proved the condition, and it had been shewn undeniably, that Daniel should not remain bound, the chancellor should nqt relieve them, for two reasons:
fraqf without allnefféciaal as allegation without
1st. The objection to their liability on the bonds would be purely technical and legal, and should have been pleaded at law.
There is no proof, that there was any fraud prac. ficed on them in the execution of the notes.
|d; When, after they had permitted judgments to. *405 be rendered on the notes, they appeal to the conscience of the chancellor for justice, he will require them to do justice; and will see whether they had curredany equitable liability; and, therefore, because they had, by their letter, promised to become bound alone, and because Hunt had made his contract and surrendered available rights, on the faith of that promise; the chancellor should refuse to release them; but should let the law take its course, and exact that which the parties were bound in equity and conscience to perform.
The decree, therefore, in favor of Mason and Stock-ion, is manifestly erroneous.
Daniel’s claim to relief against Hunt, has been placed on more solid ground than that ou which Mason and Stockton attempted to establish theirs. He alleged facts, which, as to him, gave the court jurisdiction, and entitled him to a perpetuation of the injunctions and to entire exoneration, if his allegations have been sufficiently proved. To justify the decree which was rendered in his favor, three things, however, must be established.
1st. That Morrison bad such a title to the slaves, as will enable his executor to hold them against the claim of Daniel’s trustee.
2d. That Hunt knew of Morrison’s right, and to induce Daniel, to sign the note, falsely represented to him, that be had no knowledge of any claim to the slaves.
3d. That the property conveyed to Everetin trust, is insufficient without the slaves, to indemnify Daniel, Mason and Stockton, as the sureties of Garret. These things are indispensable in equity, whatever might have been sufficient at law.
The first proposition has not been maintained. It seems, that Morrison’s right was neither investigated by the parlies, nor considered by the court, And all that we can now say about it,is, that there is nothing in the record which would authorise this court to decide (if it were necessary to express a judicial opinion,) that the validity of the claim under the deed to Ev-eret, is affected by the right to the slaves claimed by Morrison, and recovered by his executor from Garret.
*406 The .judgment against Garret, is no evidence aSa>ns*' right of his sureties. They were not parties; and their title not only was not, but could not have been put in issue in the action of detinue against Garret. In that suit, Clay had a right to recover, if he proved a purchase of the slaves by Morrison from Garret, which, as between them, would be legal and binding. But the contract of purchase might have been good between the parties, and nevertheless void, as to subsequent purchasers from Garret.
The simple, fact, (had it been proved) that Morrison had purchased the slaves and left them with Garret, would not be sufficient to justify a decree against Hunt, even if the 2d and 3d propositions were well sustained.
But neither of these is, in our opinion, as well maintained as they should be.
Hunt positively denies that he knew of Morrison’s claim, that the claim is valid against himself or the sureties of Garret, and that he ever made any representation to Daniel about any other claim or lien on-the slaves than his own.
Two depositions only, are relied upon to prove Hunt’s notice of Morrison’s claim. Thomas Pindall swears that he had an impression (hat he told Hunt of Morrison’s purchase; but that his impression was derived by inferrencc from the fact, that he ought to have told him of it, and therefore that he did. The release, however, to Garret for Hunt’s, benefit, except such property as had been sold by the trustees, but has no allusion to the sale of the slaves by Garret, to Morrison! Moreover, it is perfectly reasonable and natural for an honest man to make the inference which Pindall has done, although the fact inferred had never occurred.
Wiliam Garret, the other witness, swears, that “as well as he now recollects, about the first-or middle of November, 1818, or the last of October in the year 1818, he was at the tavern of Capt. Banks in the town of Mountsterling, and John W. Hunt was there. He remembers, that said Hunt asked Capt. Banks, if he had valued the negroes, then in the possession of Thomas J. Garret, to James MorrisoD, deceased. Ele *407 answered, that he had. The said Hunt, asked Capt. Banks at what’price, and Banks stated, as this defendant believes, upwards of $2,000.”
This deposition is not satisfactory, for several reasons:
1st. The witness is too indefinite as to time; why he should suppose that he heard the conversation, either about the first, or the middle of November, or the last of October, he has not stated. It would have been much better to have said “sometime in the fall of the year 1818.
2d. The witness, if he did not make a mistake as to the time, does not directly swear that Hunt had notice of Morrison’s purchase.
3d. It is far from being a necessary inference from' the facts stated by the witness, that Hunt had notice of Morrison’s purchase. He was negotiating with Garret, and therefore, might have been desirous to ascertain the value of the slaves. He might have heard that Banks had put an estimate upon them, at the request of Garret and Morrison, to effectuate some proposed contract between them, which was never consumated. The complainants in their cross-bill, state that Garret had assured them, that Morrison had not bought the slaves. May it not be equally probable that he made a similar asseveration to Hunt? If he did, then, especially as Garret still retained the use and possession of the slaves, Hunt might have supposed, that though the slaves had been valued for Morrison, he had not taken them by purchase.
4th. if Hunt knew that Morrison had made a contract of purchase, he might also have entertained the opinion that the sale would be void, as to" the creditors of Garret, or subsequent “tones fide'1 purchasers from him; and neither this deposition nor any thing else in the record shows, whether it was such a contract as would thus far be void.
The complainants in the cross bill, stated that they' had no knowledge of Morrison’s purchase before they signed the notes. They, or some of them, lived in Mountsterling where the slaves were, and where Garret and Banks both resided. And the fact that,, they had never heard of a sale to Morrison, diminish-' *408 es the probability, that Hunt had a knowledge of its
We are inclined- to the opinion, therefore, that a just and reasonable interpretation of all the facts would not allow the court to decide that Hunt knew of Morrison’s having a right to the slaves when Daniel signed the notes. Hunt did not, it is true, take a lien on the slaves to secure his debt; But this fact-should not be considered as any evidence of his knowledge of any claim to them by Morrison; because he' did not take a lien on the other property which was released to Garret, for his benefit. He had made conditionally, (we presume) the contract with Garret, which was afterwards carried into effect, and whereby, he accepted Garret’s individual notes, certain' property, and the seven notes for $3,500, in satisfaction of his debt. We cannot infer any thing against him, as to the imputed notice, from the fact, that he' took no lien on the slaves.
Only two depositions were taken to prove that' Hunt represented to Daniel, that he knew of no’ other claim to the slaves, than that of Garret.
Garret himself, in his deposition, states, that when' he presented the notes for signature, he exhibited the release by Pindali’s trustees to him for the benefit of Hunt; that Mason and Stockton signed the notes, but Daniel declined to sign them, until he could see Hunt; that afterwards, when Hunt came to Mount-sterling, Daniel enquired of him, (Hunt) “if there was any lien or incumbrance on the negroes.” “Mr. Hunt replied, there Was none to his knowledge. Mr. Daniel then requested Mr. Hunt to give him, a written release; Mr. Hunt replied, it was unnecessary, that he had no lien and knew of none upon the property, and referred them to the release which I had brought from Lexington, to show that the property Was released.
John McFarren, the other witness, swears, that iif the fall of 1818, or spring of 1819, he heard a conversation between Hunt and Daniel, in the presence1 of T. J. Garret, Mason and others, in which “Daniel1 refused to go security, unless some negroes, then in ther possession of T. J. Garret, were free from all kind! ©f embarrassment; for be stated, it was on the faitfe *409 ®f those negroes being an indemnity to him, that he would go said Garret’s security. The said Hunt replied, that the said negroes were released by Pin-dall’s trustees for his benefit, and that he gave up all right that he had to said negroes, and that he knew of no other claim on said negros; upon said representations, said Daniel agreed to go security.”
It is probable, and even almost certain, that the interview mentioned in each of these depositions, was the same. And we cannot give to this testimony the-full effect of overturning the answer of Hunt,for the following, among other reasons:
1st. There is not an exact and circumstantial coincidence in the statements of the two witnesses. It will be seen, by scrutinizing their depositions, that the discrepancy between them is as material, as that is between a]declaration by Hunt, that ha had no lien, and the declaration which either of the depositions attributes to him.
2d. Garret, however veracious, manifests some of that favorable disposition towards his sureties which is natural, and is perhaps most decidedly felt by those of the purest morality and honor.
It-might Have been easy for the witnesses not to observe the important difference between a declaration by Hunt, that he had no lien, and an assurance that he knew of no claim on the slaves; and the time, the place, (the street) and other circumstances of the conversation, render it very improbable, that either of the witnesses could recollect the precise words which either Daniel or Hunt employed.
3d. It is intrinsically improbable, that Daniel would have sought from Hunt information as to the condition of Garret’s estate, except so far as Hunt might have had a claim on it. Hunt lived in Lexington, Garret and Daniel resided in Mountsterling, and were, as we are authorised to believe,intimate acquaintances and cordial friends. Is it probable then, that Hunt would know more about Garret’s property and condition than Daniel did? or is it credible, that Daniel should be unwilling to confide in his own knowledge, and the assurancéá of his friend, but would be perfectly" *410 willing to adventure on the opinion of Sunt, comparatively a stranger?
4th. But the release to Garret furnishes a clue to-the conversation and to Daniel’s object in seeking it. That instrument shewed on its face, that it was made for Hunt’s benefit; Garret had exhibited it to his friends, to assure them that the property had been released, and was then free from incumbrance, Daniel had a right to suppose, that it was not free, but would be subject to Hunt’s demand; as, therefore, he was solicited to become surety to Hunt fora part of that demand,it was natural and prudent to desire to ascertain from Hunt, whether he had or would insist on any lien on the property:
There was an obvious motive for an enquiry of Hunt for this purpose, and to this extent; but none whatever, for any other or further enquiry. And that this alone was Daniel’s object, is almost proved by Garret’s deposition. He swears, that Daniel en-quired of Hunt whether he had any lien, and when informed that he had not, and assured that he claimed nothing under the deed of release, Daniel proposed that Hunt should give him a release of his claim under the deed of release to Garret. It is evident, that such a release would alone have been perfectly satisfactory to him, and it appears that he was satisfied without it, after Hunt explained to him why he had no claim to the property. But if it had been clearly proved that Hunt assured Daniel that he knew of no claim to the slaves, this would not avail without proof of the “scienter.”
We feel authorised to doubt the accuracy of the verbal recollection of the witnesses, when they state that Hunt told Daniel that he neither had any lien himself, nor knew of any; and still more, to doubt whether (if such assurance were given by Hunt) it had, or was intended to have on Daniel any other or greater influence, than to satisfy him that Hunt would not put up any claim to the slaves.
Under all the circumstances, we cannot decide that Hunt has sworn falsely in his answer, and committed a fraud on Daniel; a different construction of the facts is more consistent with the rules of evidence and the principles of law; and is, therefore, in our opinion, more just and rational.
*411 But lastly, it has not been shewn that Garret’s sureties have been, or are in any danger of being injured by any thing that Hunt said or did. They have shown that, if the slaves be the property of Morrison, the other estate secured to them by the deed of trust, would be insufficient for their indemnity; nor have they shown what disposition has been made of it, or any of it. If it be sufficient to indemnify them, then it would be immaterial whether Daniel was or was., not induced by Hunt to believe that the slaves were unincumbered. His only object must be supposed to have been to ascertain whether he could be made secure. If he be secure, he can ask no more. It would seem from the description of the property in the deed to Everet, that without the slaves, it ought to be enough to indemnify-those for whose benefit it was made; at least, we will not presume, that it is insufficient without any proof. Hunt might be the victim of injustice and of fraud Joo, if the decree were permitted to stand. He gave up a lien on Garret’s estate, on receiving notes with personal security.
The sureties in those notes, took a lien on the whole of Garret’s estate, for their indemnity; if they be now released, Hunt might be deprived of all redress. The property conveyed to Everet, may all have been sold and appropriated by Garret and his sureties.
Surely, if otherwise, the decree of the circuit court were sustainable, it was improvident to perpetuate the injunctions, without knowing what had been done with the property conveyed to Everet.
Upon the whole, we are of opinion, that the circuit court erred in perpetuating the injunctions to the judgments at law, and in decreeing relief to any of the complainants in the cross bill.
The decree of the circuit court, perpetuating the injunctions, and exonerating Daniel, Mason and Stockton, from their liability as sureties for Garret to Hunt, is reversed, and the cause remanded, with instructions to dissolve the injunctions with damages, and to dismiss tbe original cross bill, against Hunt, and the amended cross bill with costs.
Daniel, Mason and Stockton, must pay to Hunt his costs in this court.
Petition for á re-heariug.